404 S.E.2d 65 (1991)
George BETHEA, Jr.
v.
COMMONWEALTH of Virginia.
Record No. 0371-89-2.
Court of Appeals of Virginia.
April 16, 1991.
Rehearing En Banc Granted May 30, 1991.
*66 Russell C. Williams, Asst. Public Defender, for appellant.
Marla Lynn Graff, Asst. Atty. Gen. (Mary Sue Terry, Atty. Gen., on brief), for appellee.
Present: BARROW, BENTON and COLEMAN, JJ.
BENTON, Judge.
George Bethea, Jr. was convicted at a bench trial for possession of cocaine with the intent to distribute. His appeal questions whether a police officer unreasonably detained him during a routine traffic stop of an automobile in which he was a passenger. We hold that the trial judge erred in overruling Bethea's motion to suppress.
Viewed in the light most favorable to the Commonwealth, Higginbotham v. Commonwealth, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975), the evidence established that police officers Marvin T. Paulus and Henry F. Warren were in an unmarked automobile at 2:15 p.m., when they noticed Bethea and two other men in an automobile. Bethea was in the front passenger seat of the automobile. The officers were to the right of the automobile and headed in the same direction. Both officers testified that Paulus had a camera which he used to take photographs while the automobiles were side-by-side. Paulus testified that Bethea was waving and "making faces before [he] took the pictures." Paulus further testified that he was taking photographs because he and Warren "had just moved into that area, and [were] tak[ing] pictures of the people for identification."
Bethea and the other men in the automobile testified that when their automobile came to a stop at the traffic light, they saw two police officers in an unmarked automobile beside their automobile. They all testified that one of the officers had a camera in his hand and was taking pictures of them. Warren testified that Bethea "was making gestures before and during the picture taking." He also testified:
As we approached the car, Sergeant Paulus brought to my attention to look over here, and I looked to my left, and I observed Mr. Bethea, and he was making faces, moving his hands and things like this here, and first, it just really frightened me. I didn't know what was coming off.
Warren said that Bethea was not shaking his fist, pointing his finger, or making obscene gestures at the officers. During his testimony, Warren demonstrated the hand gestures to the trial judge. After Warren observed Bethea's actions, Warren then:
told Sergeant Paulus to pull back behind him a little bit. As we were pulling behind him, I checked his car. I wanted to see if there was anything suspicious. First thing I observed was the lack of a city sticker when we got back in the back of his car. I told Sergeant Paulus let's go ahead and pull him.
After the automobile stopped, Paulus walked to the driver's window and asked the driver to get out of the automobile and stand on the sidewalk. Paulus was standing in the street while talking to the driver. He testified that he asked the driver to exit the automobile in order that "he could get out of traffic" while talking to the driver. When Paulus learned that the driver did not have an operator's license with him, Paulus "ran [a] check through the Department of Motor Vehicles to be sure that he did have a driver's license." After about ten minutes, the dispatcher informed Paulus that the driver had a valid operator's license.
Warren had positioned himself on the automobile's passenger side. When he approached the automobile, Bethea did not say anything, make any threats, or resist. Warren described the scene:
I looked at Mr. Bethea first. I glanced into the car. I hadI didn't know at that time if there was a weapon or what in the car. Couple of seconds later I asked him, would you please step out of the car. I took him in position right in front of his door near the hood of the car. There was a passenger in the rear *67 seat, so at this time I asked the passenger in the rear seat to step out of the vehicle.
Warren did not frisk either passenger after they exited the automobile. As they were standing by the automobile, Officer Pence arrived at the scene. Pence testified that when he looked in the automobile, he saw rice in the front passenger seat and on the floor board. He testified "that rice is sometimes used to keep heroin and cocaine dry."
Pence noticed that Bethea was holding his waistline and appeared to be adjusting something as he jumped onto the trunk of the automobile. Pence asked Bethea to move his hands within view and pulled Bethea away from the automobile to frisk him. At that moment, a bag containing cocaine fell from Bethea's shorts. After all three of the occupants were searched, Bethea was arrested. Pence then gave the driver a citation for not having a city license affixed to the automobile and allowed the driver and other passenger to depart.
The trial judge overruled Bethea's motion to suppress the cocaine, stating that the stop was justified. The judge stated that Bethea exited the automobile upon Warren's polite request and that Pence frisked Bethea after Pence developed a suspicion that Bethea might be carrying a weapon. The issue presented by this appeal is narrow because the Commonwealth concedes that when the police stopped the automobile Bethea was seized and detained for Fourth Amendment purposes. Further, Bethea does not contest the lawfulness of the initial stop. Thus, we address the sole issue whether it was unreasonable for Warren to ask Bethea to step out of the automobile under these circumstances.
Once an automobile has been stopped a police officer's request, albeit polite, that the occupants get out of the vehicle can only be interpreted as a command. See State v. Becker, 458 N.W.2d 604, 606-07 (Iowa 1990) (where the court construed an officer's request under similar circumstances to be an order). In this case, Warren testified that after asking Bethea to get out of the automobile he "took him in position at the front of his door near the hood of the car." Warren's display of authority refutes any suggestion that Bethea's movements were consensual. Thus, the question becomes whether Warren, in the course of a traffic stop, reasonably suspected that Bethea had committed, was committing, or was about to commit a felony or whether he criminally possessed a concealed weapon. If Warren did not have a suspicion of criminal activity, he improperly elevated the intrusion beyond the incidental restraint imposed by the traffic stop.[1]
"[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Lansdown v. Commonwealth, 226 Va. 204, 209, 308 S.E.2d 106, 110 (1983) (quoting Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968)), cert. denied, 465 U.S. 1104, 104 S.Ct. 1604, 80 L.Ed.2d 134 (1984). Prior to the stop, Warren observed Bethea making faces and moving his hands up and down. Neither officer testified that Bethea's actions were indicative of criminal conduct or suggested that a crime was occurring. Although Paulus testified that he took photographs of Bethea because he photographs "anyone that draws our attention for any unusual circumstance," none of the photographs were produced at trial. It is likewise a significant circumstance that Bethea's facial and hand gestures occurred contemporaneously with Paulus' attempt to obtain photographs of Bethea and his companions, *68 while taking "pictures of the people for identification."[2]
The record leaves unanswered whether Bethea saw the officers taking photographs before the officers first saw him and, thus, does not negate an inference that the gestures were prompted by the display of the camera. The facts do not create a reasonable suspicion that Bethea had committed, was committing, or was about to commit a felony. In addition, "the officer's action [must be] reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20, 88 S.Ct. at 1879. It is undisputed that Bethea's conduct was not the justification for the police stopping the automobile. The occupants of the automobile were not suspects of any reported crime. Compare Harris v. Commonwealth, 9 Va.App. 355, 388 S.E.2d 280 (1990), rev'd on other grounds, 241 Va. 146, 400 S.E.2d 191 (1991). The officers stopped the automobile because it did not display a city automobile license. There is no suggestion that the driver was considered to be a threat. Paulus testified that he asked the driver to exit the automobile and stand on the sidewalk in order to give Paulus protection from the traffic flow.
We reject the Commonwealth's contention that Warren was justified in ordering Bethea out of the automobile for the officer's protection. Warren simply testified, without elaboration or explanation, that the facial and hand gestures frightened him. Paulus observed the same conduct and testified only that Bethea "was waving and making faces." The trial judge's observation that persons who make faces at police officers bear watching is too generalized a reason to conclude that Warren's subjective apprehension was reasonable.
When Warren approached the automobile, Bethea remained calm in the front seat, making no threatening statements or actions. The record does not reflect that Warren made an inquiry of Bethea regarding the face and hand gestures that he observed. There is no evidence of furtive gestures, belligerence, or uncooperative behavior by Bethea or the other passenger. Moreover, Warren did not testify that there was anything to indicate that Bethea may have been concealing a gun, knife, club, or other dangerous weapon. Compare Simmons v. Commonwealth, 217 Va. 552, 556, 231 S.E.2d 218, 220-21 (1977) (where the investigating officer had reason to believe the suspected burglar was armed and saw the suspect's jacket sagging in the front, "the officer had reasonable cause to believe that defendant might be carrying a concealed weapon and the search was warranted"). Although Warren asked Bethea and the third man to exit the automobile because he "felt more comfortable with both of them standing," he did not frisk either person. That Warren was uncomfortable because he had made an unrelated traffic stop the day before and found weapons on the front seat of an automobile provides no basis upon which Warren could have reasonably suspected that criminal activity was afoot in this incident or that Bethea possessed a concealed weapon in violation of Code § 18.2-308.
"In the absence of any basis for suspecting appellant of misconduct, the balance between the public interest and appellant's right to personal security and privacy tilts in favor of freedom from police interference." Brown v. Texas, 443 U.S. 47, 52, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979). This principle holds true for passengers in cars stopped for routine traffic infractions. Accord Becker, 458 N.W.2d at 607. Bethea's right to personal security and privacy shielded him from the intrusion of being ordered out of the car. "[E]ach individual is `clothed with constitutional protection against an unreasonable ... seizure,' which may not be denied by the individual's `mere propinquity to others independently suspected of criminal activity.'" State v. Damm, 246 Kan. 220, 225, 787 P.2d 1185, 1189 (1990) (quoting Ybarra v. Illinois, 444 U.S. 85, 91, 100 S.Ct. 338, *69 342, 62 L.Ed.2d 238 (1979)). Indeed, the officer did more than order Bethea to exit the car. The officer "took him in position" at the front of the automobile and further exacerbated the intrusion by restricting Bethea's movement to the position he was required to assume at the side of the automobile.
By its express terms, Pennsylvania v. Mimms, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) does not control this case. The Mimms opinion "hold[s] only that once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." Id. at 111 n. 6, 98 S.Ct. at 333 n. 6 (emphasis added). Indeed, the Court noted that its decision focused on the driver rather than "occupants" in general. Id. at 110 n. 5, 98 S.Ct. at 333 n. 5. Underlying the Court's reasoning is the premise that the driver was lawfully detained. Id. at 109, 98 S.Ct. at 332.
[T]he treatment by the Supreme Court of the intrusion into the driver's personal liberty is not dispositive of the issue at hand. As the court noted, by stopping the automobile the police have decided that the driver will be detained. Such is not the case for the passenger, who has broken no law and who may walk away from the scene unless the police officer has some other legitimate reason to detain him. Certainly the passenger has a higher expectation of privacy than the driver, because the passenger plays no part in the routine traffic infraction and has reason to suppose that any exchange with the authorities will be conducted by the driver alone. To give the police officer the discretion to order the passenger from the automobile without requiring any explanation of the officer's actions (other than a blanket concern for personal safety in all situations) is to abandon the requirement of individualized inquiry into the reasons for an intrusion.
State v. Williams, 366 So.2d 1369, 1374 (La.1978).
In summary, the law requires an articulation of a reasonable basis for interfering with a citizen's right to personal security and privacy. Terry, 392 U.S. at 21, 88 S.Ct. at 1879. The traffic stop and initial detentions were not based on suspicions that those detained were either concealing dangerous weapons or involved in criminal activities. When Bethea was ordered from the vehicle "there was no articulable suspicion of wrongdoing on his part or any need to move him in order to facilitate [questioning] of the driver." Becker, 458 N.W.2d at 607-08. Likewise, the officer possessed no apparent need to remove the passengers for the officers' safety. Accordingly, the trial judge erred in overruling Bethea's motion to suppress.
Because the only evidence supporting the conviction was a product of the unlawful detention and should have been suppressed, Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), we reverse the conviction.
Reversed.
COLEMAN, Justice, dissenting.
I agree with the majority that this appeal presents the narrow issue "whether it was unreasonable for [Officer] Warren to ask Bethea [who was a passenger in a legally detained car] to step out of the car." The majority concludes that, in order for Officer Warren legally to have requested that Bethea exit the car, Warren must have "reasonably suspected that Bethea had committed, was committing, or was about to commit a felony," Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968), or reasonably suspected that Bethea was armed and dangerous. Simmons v. Commonwealth, 217 Va. 552, 555-56, 231 S.E.2d 218, 220-21 (1977) (quoting Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)). However, in my view, the principles announced in Pennsylvania v. Mimms, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), control this case and require that we uphold the ruling of the trial court, which found that Officer Warren was justified under all of the circumstances in asking Bethea to exit the vehicle in order to establish a face-to-face confrontation and, thereby, diminish the possibility of danger from "assault" and *70 "unobserved movements." Id. at 110, 98 S.Ct. at 333. Accordingly, I dissent and would affirm the ruling of the trial court which admitted into evidence the drugs which fell from Bethea's shorts after he exited the vehicle.
Admittedly, the Mimms case involved the driver of the vehicle, rather than a passenger, who was asked to exit his vehicle after being routinely stopped for driving with an expired license plate. But, as Justice Stevens writing for the dissenters in Mimms acknowledged, "the Court's logic necessarily encompasses the passenger," id. at 122, 98 S.Ct. at 339, even though in the case of a passenger, other considerations exist that must be weighed in the balancing equation in order to decide whether the intrusion by the state on the individual's privacy interest is reasonable under the circumstances. See W. LaFave Search and Seizure § 5.2(h) (2d ed.1987). Justice Powell, in a concurring opinion in Rakas v. Illinois, in which he was construing Pennsylvania v. Mimms, stated: "Last term, this Court determined in Pennsylvania v. Mimms that passengers in automobiles have no Fourth Amendment right not to be ordered from their vehicle, once a proper stop is made." Rakas, 439 U.S. 128, n. 4 at 155, 99 S.Ct. 421, n. 4 at 436, 58 L.Ed.2d 387 (1978). Because the passenger has no possessory interest in the vehicle, he has no expectation of privacy inside the vehicle. Although the passenger has a personal expectation of privacy under the fourth amendment which would protect him from an unreasonable search of his person, that right is not infringed by ordering the person to exit the vehicle where no personal search or seizure has occurred.
Nevertheless, assuming that fourth amendment considerations obtain, the Mimms decision expressly rejected the rationale upon which the majority here relies. The majority's approach is the same approach upon which the Pennsylvania Supreme Court based its decision in Mimms, namely, to justify the minimal intrusion of having an occupant exit the vehicle, the officer must suspect of the occupant that criminal activity is afoot or that he is armed and dangerous. Id. 434 U.S. at 108, 98 S.Ct. at 332. The United States Supreme Court, however, rejected that approach and held that asking a driver to exit a car after a lawful stop "can only be described as a de minimis [intrusion in which the] driver is being asked to expose to view very little more of his person than is already exposed." Id. at 111, 98 S.Ct. at 333. Since no physical search or touching of the person is involved, having the driver, and likewise the passenger, stand where he can be observed is "not a `serious intrusion upon the sanctity of the person,' ... it hardly rises to the level of a `petty indignity.'" Id. at 111, 98 S.Ct. at 333 (quoting Terry v. Ohio, 392 U.S. 1, 17, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968). "What is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety." Id. 434 U.S. at 111, 98 S.Ct. at 333.
In rejecting the argument that this type of minimal intrusion requires a reasonable suspicion of crime or that the passenger is armed and dangerous, the United States Supreme Court in Mimms defined the state interest which justified the action:
We think it too plain for argument that the State's proffered justificationthe safety of the officeris both legitimate and weighty. "Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." Terry v. Ohio, supra, 392 U.S. at 23 [88 S.Ct. at 1881].... [W]e have before expressly declined to accept the argument that traffic violations necessarily involve less danger to officers than other types of confrontations...." [A] significant percentage of murders of police officers occurs when the officers are making traffic stops," [United States v. Robinson, 414 U.S. 218, 234, n. 5, 94 S.Ct. 467, 476, n. 5, 38 L.Ed.2d 427] (1973).
Id. at 110, 98 S.Ct. at 333. Thus, even if the rationale in Mimms and Rakas do not support the proposition that every legal stop of a driver for a traffic infraction justifies having the passenger exit the vehicle, where the circumstances give rise to reasonable safety considerations, an officer may request or order a passenger to exit the vehicle.[3]
*71 Here, no factors were present that supported Bethea's argument that he had a privacy interest that made Officer Warren's request that he exit the vehicle unreasonable. In fact, although the conduct of Bethea did not give rise to a reasonable suspicion of criminal activity or that he was armed and dangerous, his behavior, which consisted of gestures and antics toward the police officers which were demonstrated to the trial judge, was sufficiently out of the ordinary to warrant a prudent officer in taking the minimal precaution of having that person stand where he could be more readily observed. "Weird and unsettling developments before and during the stop gave the officers the additional cause to order the driver and his passengers out of the car." United States v. Wilkerson, 598 F.2d 621, 624 (D.C.Cir.1978) (citing Pennsylvania v. Mimms, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977)); see also United States v. Pelley, 572 F.2d 264, 266 (10th Cir.1978). In my view, Mimms requires that we affirm the ruling of the trial court.

UPON A PETITION FOR REHEARING EN BANC

BEFORE THE FULL COURT
On April 30, 1991 came the appellee, by the Attorney General of Virginia, and filed a petition praying that the Court set aside the judgment rendered herein on April 16, 1991 and grant a rehearing en banc thereof.
On consideration whereof, the petition for rehearing en banc is granted, the mandate entered herein on April 16, 1991 is stayed pending the decision of the Court en banc, and the appeal is reinstated on the docket of this Court.
The parties shall file briefs in compliance with Rule 5A:35. It is further ordered that the appellee shall file with the clerk of this Court ten additional copies of the appendix previously filed in this case.
NOTES
[1] We do not address whether the police would be warranted in removing the passenger from the automobile if necessary to effectuate a custodial arrest of the driver or accomplish a search of the automobile incident to an arrest under New York v. Belton, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). The driver's failure to display a city automobile license was a violation of City of Richmond Code § 28-333 (1979). This violation can result, at most, in a $15 fine and is not designated by ordinance to be a misdemeanor. City of Richmond Code § 28-334; see also Code § 46.2-752. Accordingly, this case does not involve a search incident to arrest based on a misdemeanor committed in an officer's presence.
[2] We are not asked to address, and we do not address, any issues concerning the taking of photographs. We only relate the police conduct of photographing citizens in the context of the total factual circumstances of this incident.
[3] We are not confronted with a situation where the passenger, or driver, would apparently pose no threat to the safety of the officers by virtue of such factors as the age or health of the person or other extrinsic considerations, or where exiting the car may pose a threat to the safety or health of the person or a substantial inconvenience due to factors such as heavy traffic or inclement weather. Whether a request to exit a vehicle under those conditions infringes protected privacy interests and may constitute an unreasonable detention we leave for another time.